# Klein Decl. Exhibit 36

```
 1           UNITED STATES DISTRICT COURT

 2           MIDDLE DISTRICT OF NORTH CAROLINA

 3

 4
     ZION WILLIAMSON          CIVIL ACTION NO.
 5
     VERSUS                   1:19-CV-00593-LCB-JLW
 6
     PRIME SPORTS MARKETING,
 7   LLC AND GINA FORD

 8

 9

10   VIDEOTAPED DEPOSITION OF LEANDER (LEE) ANDERSON,
     TAKEN AT THE ROOSEVELT NEW ORLEANS, 130 ROOSEVELT
11   WAY, NEW ORLEANS, LOUISIANA, ON THE 9TH DAY OF
     DECEMBER, 2021, COMMENCING AT 9:02 A.M. AND
12   CONCLUDING AT 7:00 P.M.

13

14

15
     REPORTED BY:
16

17        RUBY M. WALLEN
          CERTIFIED COURT REPORTER
18

19

20

21

22

23

24

25
```

1    A.    Yes, sir.
2    Q.    And you guys looked at it and talked
3  about it.  Right, sir?
4    MR. KLEIN:
5        Objection.  Foundation.
6    THE WITNESS:
7        They went over it.  They went over it.
8  Yes.
9  BY MR. DRUMMOND:
10   Q.    Did you ask questions?
11   A.    I listened to their presentation.
12   Q.    The question to you was:  Did they ask
13  you questions?
14   A.    I don't think they asked questions.
15  They just went over what was in the book.
16   Q.    Did you ask questions?
17   A.    No.
18   Q.    What about your wife?
19   A.    My wife wasn't there.
20   Q.    It was just you?
21   A.    Yes.
22   Q.    Okay.  And did you ask for a copy of
23  that plan after you left that meeting?
24   A.    They gave me a copy.  I didn't ask for
25  it.

1  Q.  Did you give it back to them?
2  A.  No.
3  Q.  You left with it?
4  A.  Yes.
5  Q.  Okay. Now, I'm showing you that which
6  is marked as Williamson K. And, Mr. Klein, take a
7  look, please.
8     MR. KLEIN:
9        Okay.
10 BY MR. DRUMMOND:
11 Q.  Okay. Now, before we do, let's just
12 go through the remaining exhibits and just read them.
13 I think that will set the background for the
14 communication. If you go to Bates number -- just
15 review 304, 303, 302, 301, 300, 299, 298 and 297. If
16 you could quickly review those for me, sir.
17       Do you see what I'm talking about?
18 A.  What page are you stopping at, you
19 said?
20 Q.  The last one. Yeah.
21    MR. KLEIN:
22       I think he wants you to read it all
23 the way through, each page to the end.
24 BY MR. DRUMMOND:
25 Q.  Yeah.

1      Q.    The first one I'm looking at, it is
2   dated May 25th, 2019 at 3:06 P.M. and it has a "From"
3   line.  Is that you, the "From"?
4      A.    From, okay.  Yes.  "Hope all is well.
5   Let me know when the wire" -- oh.  He evidently told
6   me he was going to wire it at a certain time.  I just
7   told him, let me know when he's done it.
8      Q.    Okay.  When you say, well, let me know
9   when the wire is done, what wire are you referring
10  to?
11     A.    Well, he was talking about the money
12  that he, you know, insisted.  The money that he
13  mentioned to us that they normally do when they sign
14  people, you know, to whatever account.
15     Q.    This now is in May, you know, sir.
16  I'm talking about --
17     A.    Oh.
18     Q.    -- May 25th.  Is that the money from
19  Hobbs & Shaw?
20     A.    Hobbs & Shaw, then, that is what that
21  is.  Yes.
22     Q.    Now, you said you were alluding to
23  earlier on, $100,000 was sent.  Is it your testimony
24  that Mr. Luchey in April of 2019 insisted on sending
25  you $100,000 at the signing of Zion Williamson?

1  A. Yeah. He made the comment to us. He
2  suggested to us that that's what they do for their
3  clients when they sign clients.
4  Q. So is it your testimony here that you
5  were not the one who initiated getting $100,000?
6  A. Definitely not.
7  Q. And it is Mr. Luchey who insisted on
8  saying, now we are signing, why don't we give you
9  $100,000. That is your testimony?
10  A. That is customary, what he said. He
11  said, this is a customary thing. And, you know, when
12  we sign people, we give them, you know, an advance
13  on, you know, whatever. You know, his clients. Hey,
14  that's what he told me.
15  Q. I want to make sure we are clear on
16  that.
17  A. Yes.
18  Q. Mr. Luchey on or about April 20th at
19  the signing of Zion Williamson in your home, in North
20  Carolina, insisted on giving you and sending to Zion
21  Williamson $100,000, sir?
22  A. Maybe insisted is not the proper term.
23  But he said -- not in the home, no. It wasn't in our
24  home. We were in our car. And he was sitting in the
25  front seat -- I think front seat or back seat. One

1  of them. But he turned to me and said, hey, listen.
2  Now that we got all this behind us, it is customary
3  that we give our clients, you know, some funds to
4  operate off of. You know, you have a lot to do
5  coming up. We give our people some funds to operate
6  off of. That came strictly from Andrew Luchey.
7      Q.   I understand. I want to make sure we
8  have the context of it right.
9      A.   Yeah.
10     Q.   So you are sitting in your car in the
11 back and you didn't bring up any money regarding --
12     A.   No.
13     Q.   -- finances. Right, sir?
14     A.   No. I didn't.
15     Q.   And at this point, it is your
16 testimony that they already had signed Zion
17 Williamson. Right, sir?
18     A.   I would assume. I mean, it would have
19 to be, because that is when he said it. Yes.
20     Q.   So the signing had already taken place
21 in your home. Right, sir?
22     A.   Yes.
23     Q.   And while you were in your home, no
24 money was mentioned. Right, sir?
25     A.   No, sir.

1  information regarding how that money should be wired
2  to you, sir?
3      A.   Before Mr. Luchey left.  Yes.  He told
4  me to send him the information, whatever the
5  information was.
6      Q.   So we are clear as to this point.  It
7  is your testimony here under oath that at no point
8  did you, your wife, Mrs. Anderson or Zion Williamson,
9  ask for any money?
10     A.   Correct.
11     Q.   And this was all suggested by Mr.
12 Andrew Luchey to the tune of $100,000?
13     A.   Correct.
14     Q.   Okay.  So going back to the exhibit
15 that is before you.
16     A.   Uh-huh.
17     Q.   May 25th, you are asking about the
18 money from Hobbs & Shaw, sir?
19     A.   Yes.
20     Q.   Okay.  How much money was that?
21     A.   To tell you the truth, I can't
22 remember what it was.
23     Q.   Do you know, was that money now money
24 to be received from Hobbs & Shaw based upon the work
25 that was performed in California?

1    no. So let's move on.

2         THE WITNESS:

3              Let me answer that. Yeah. I said no,

4    because Gatorade came to us. We met Gatorade long

5    before this right here.

6    BY MR. DRUMMOND:

7         Q.   How long ago had you met Gatorade?

8         A.   During the basketball season at Duke.

9         Q.   When was that?

10        A.   Right at the end of the season.

11        Q.   So about what month was that, sir?

12        A.   February, early March probably.

13        Q.   Okay. So I'm talking about now, Miss

14   Metelus' role.

15        A.   Yeah. I understand, but all this --

16        Q.   Let me finish the question.

17        A.   Okay.

18        Q.   Miss Metelus now. I'm not saying you

19   didn't meet Gatorade before.

20        A.   Okay.

21        Q.   I'm asking about when Miss Metelus

22   sent this E-mail, was that an opportunity you think

23   she was advancing regarding getting Zion Williamson,

24   you and your wife, to meet the people from Gatorade

25   that they have marketing relationships with?

1    A.    All right.
2    Q.    I'm only asking you now what words
3  came out of your mouth?
4    A.    About what?
5    Q.    About when you received this
6  communication, May 23rd, 2019, you were actually at
7  the Hobbs & Shaw shoot with Miss Ford there?
8    A.    Okay.
9    Q.    Is that right?
10   A.    Yes.
11   Q.    And Miss Ford was the one, based on
12 that Exhibit B, that brought in the Panini deal from
13 May 5th, 2019.  Right, sir?
14   A.    Okay. To your recollection, you
15 thought she -- she didn't bring that in.  She
16 probably went and pursued that.  But Panini was
17 talking to me long time before that, sir.  We already
18 had the relationship with Panini.  That was
19 something -- so Miss Ford can't even take credit for
20 that.
21   Q.    So look at the -- I want you to read
22 the May 23rd, 2019.
23   A.    I'm looking at it.  I'm looking at it.
24   Q.    Just read the top part into the
25 record.

1     A.    No. I'm not suggesting that.
2     Q.    You are not disputing that Miss Ford
3  did that?  Are you doing that, sir?
4     MR. KLEIN:
5           Objection.  Foundation.
6     THE WITNESS:
7           The relationship was already
8  established.  Whatever happened happened.
9  BY MR. DRUMMOND:
10    Q.    My question is:  You are not disputing
11 --
12    A.    No. I'm not disputing.
13    Q.    So let me be clear.  You are not
14 disputing that on or about May 5th, during that time
15 period, Miss Ford, Exhibit B that I showed you very
16 early this morning, she was the one who negotiated
17 that.  You are not disputing that?
18    A.    I questioned it.
19    Q.    So, well sir, let me understand this.
20    MR. KLEIN:
21          Stephen, could let him finish his
22 answer.  He didn't interrupt you.  You don't
23 interrupt him.
24 BY MR. DRUMMOND:
25    Q.    No. That's okay.  Go ahead.  You

1  questioned --
2      A.   No. I'm saying that deal could have
3  come whether Miss Ford was there or not.  Sir, Zion
4  was the number one player in the draft.  He was high
5  profile.  That was basic stuff.  That number that
6  came in, that 1.5, don't be misled that Miss Ford did
7  this.  These numbers were coming from everybody.
8      Q.   What I'm asking you again, sir, is
9  this:  You are not disputing that Miss Ford was the
10 one who negotiated that deal that is in Exhibit B?
11     A.   I'm not disputing it.  But I'm
12 questioning, you know, whether that actually, it
13 happened like that.  I don't go with that.
14     Q.   You are not going to credit it is what
15 you are saying?
16     A.   Well, you could call it whatever you
17 want, sir.
18     Q.   So would it be fair to say, as you sit
19 here now, you wouldn't credit any deal that she did.
20 Right, sir?
21     A.   Which deal did she do that I need to
22 give credit to?
23     Q.   No. You don't get to ask the question.
24     A.   Oh.
25     Q.   I'm just saying, as you sit here